Not for Publication

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

JAMES CORCORAN,

                Plaintiff,

                v.

CHIEF GLEN CAUWELS,

                Defendant.

Civil Action No. 18-13875 (ES) (JSA)

OPINION

**SALAS, DISTRICT JUDGE**

This action arises from a New Jersey Open Public Records Act ("OPRA") request made by Plaintiff James Corcoran in 2007.  (D.E. No. 1 ("Complaint" or "Compl.") at ¶ 16).  Plaintiff brings a single claim against Defendant Chief Glen Cauwels for violating his First Amendment rights under 42 U.S.C. § 1983 in connection with his OPRA request.  (*Id.* at ¶ 56).  Before the Court is Defendant's motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. (D.E. No. 69).  Having considered the parties' submissions, the Court decides this matter without oral argument.  *See* Fed. R. Civ. P. 78(b); Local Civ. R. 78.1(b).  For the following reasons, the motion is **DENIED.**

I.        **BACKGROUND**

        A.       **Factual Background**[1]

Unless otherwise noted, the following facts are not in dispute.  Plaintiff and Defendant are police officers employed by the Fair Lawn Police Department ("FLPD").  (Def. SMF ¶¶ 1–2; Pl.

---

[1]        The Court gathers the following facts primarily from Defendant's statement of material facts not in dispute (D.E. No. 69-2 ("Def. SMF")), Plaintiff's responses thereto (D.E. No. 72 ("Pl. Resp. SMF")), Plaintiff's supplemental statement of material facts (D.E. No. 71 ("Pl. Supp. SMF")), Defendant's responses thereto (D.E. No. 74-1 ("Def. Resp. Supp. SMF")), the Certification of Defendant's counsel, Anthony J. Vinhal, Esq. (D.E. No. 69-3 ("Vinhal Cert.")), and the exhibits thereto, as well as the Certification of Plaintiff's Counsel, Dylan T. Hastings, Esq. (D.E. No. 73 ("Hastings

Resp. SMF ¶¶ 1–2).  Plaintiff has served as a police officer for the FLPD since February 2000.  (Def. SMF ¶ 1; Pl. Resp. SMF ¶ 1).  Defendant has served as Chief of Police for the FLPD since March 2013.  (Def. SMF ¶ 2; Pl. Resp. SMF ¶ 2).

In 2006, Plaintiff was Vice President of the local chapter of the Patrolmen's Benevolent Association ("PBA"), and Defendant was a union representative for the Superior Officers Association ("SOA").  (Def. SMF ¶¶ 3–4, 5; Pl. Resp. SMF ¶¶ 3–4, 5).  Through his role within the PBA, Plaintiff came to suspect that Lieutenant William Yirce ("Lt. Yirce"), an SOA member, was misappropriating PBA funds allocated for a "Police Unity Tour" charity bicycle ride.  (Def. SMF ¶¶ 4, 13; Pl. Resp. SMF ¶¶ 4, 13; D.E. No. 69-3, Ex. 2 to Vinhal Cert. ("Corcoran Dep.") at 68:5–13).  Plaintiff testified that his suspicion arose while he was raising funds for a union event and was told by an unspecified individual that Lt. Yirce had used "$500" for "steaks in Washington D.C." (Corcoran Dep. at 49:14–25).  Plaintiff had also learned that other police union treasurers in New Jersey were being "charged" with "improper disposition of donated funds."  (Pl. Supp. SMF ¶ 9; Def. Resp. Supp. SMF ¶ 9).  "As a result" of these concerns, "Plaintiff believe[d] that the PBA needed to ensure that its members were keeping a proper accounting of all solicited funds."  (Pl. Supp. SMF ¶ 10; Def. Resp. Supp. SMF ¶ 10).

On March 14, 2007, during a PBA meeting, Plaintiff "requested an accounting" of the Police Unity Tour funds.  (Def. SMF ¶ 6; Pl. Resp. SMF ¶ 6).  On March 20, 2007, SOA member Sergeant Richard Schultz, who was also soliciting funds on behalf of the union, sent an email to then-PBA President David Boone, copying Lt. Yirce and Plaintiff, asking President Boone to "investigate [Plaintiff's] statements," and asserting that Plaintiff's "allegations were of a criminal nature."

Cert.")), and the exhibits thereto. Unless otherwise noted, pin cites to Docket Entry numbers 69-4, exhibit 5, and 69-5, exhibits 8 and 9 refer to the pagination automatically generated by the Court's electronic filing system.

(Corcoran Dep. at 50:4–9 & 53:9–54:6).[2]  Although the exact context of Sergeant Schultz's March 20, 2007 email is somewhat unclear, it appears to refer to Plaintiff's accounting request made during the March 14, 2007 PBA meeting.

At some point thereafter, according to Plaintiff's testimony, Sergeant Schultz was "secretive" and "resistant" to providing the information Plaintiff requested.  (*Id*. at 65:22–66:13).  On March 26, 2007, Plaintiff made an OPRA request for any emails Lt. Yirce and Sergeant Schultz exchanged with their SOA representatives, John Annazone and Defendant.  (Def. SMF ¶¶ 8–9; Pl. Resp. SMF ¶¶ 8–9).  According to Plaintiff, he made the OPRA request because he "wanted to find out what was being discussed, what was going on and why [Schultz was] so secretive" and "resistant to provid[ing] information."  (Corcoran Dep. at 65:22–66:13).

Subsequently, Captain Anthony Serrao received a phone call from a PBA representative asking Captain Serrao to speak with Plaintiff about withdrawing his OPRA request because "there was a chance it could cause problems for the PBA and the officers subject to the request."  (D.E. No. 73, Ex. A to Hastings Cert. ("Serrao Cert.") ¶ 6).  Captain Serrao then suggested to Plaintiff that he withdraw the request to "avoid conflict."  (*Id.* ¶ 7).  On March 27, 2007, Plaintiff withdrew his OPRA request.  (Def. SMF ¶ 16; Pl. Resp. SMF ¶ 16).

Defendant testified that prior to Plaintiff's OPRA request, he had never filed an Internal Affairs ("I.A.") complaint against Plaintiff.  (D.E. No. 69-5, Ex. 6 to Vinhal Cert. ("Cauwels Dep.") at 38:2–10).  Shortly after the OPRA request, Defendant filed an I.A. complaint against Plaintiff for allegedly using "unlawful techniques during traffic stops."  (Serrao Cert. ¶ 14).  Captain Serrao determined that the I.A. complaint was unfounded.  (*Id.* ¶¶ 16–18).[3]

---

[2]  A copy of Sergeant Schultz's March 20, 2007 email does not appear to be a part of the record before the Court.

[3]  The record includes a log listing 20 I.A. complaints lodged against Plaintiff from 2010 through 2017.  (D.E. No. 69-4, Ex. 5 to Vinhal Cert. ("I.A. Complaint Log")).  The I.A. complaints relevant to this matter are summarized in a chart below.  *Infra* at 9.  Neither the original copies of each I.A. complaints listed in the I.A. Complaint Log, nor of any I.A. complaints that pre-date 2010, appear in the record before the Court.  Each I.A. complaint entry includes a case number,

On April 4, 2007, Plaintiff became President of the PBA.  (Def. SMF ¶ 17; Pl. Resp. SMF ¶ 17).[4]  During a PBA meeting that same day, the topic of Plaintiff's accounting request arose. (Def. SMF ¶ 18; Pl. Resp. SMF ¶ 18; Corcoran Dep. at 82:20–83:10).  Defendant then asked Plaintiff if he had made an OPRA request, to which Plaintiff responded that he did.  (Corcoran Dep. at 83:3–10). During a "back and forth," between Plaintiff and Defendant, Plaintiff said, "[t]hese motherfuckers are trying to get me fired."  (Id. at 83:11–17).  While the context of Plaintiff's comment is somewhat unclear, Plaintiff testified that he was referring to Sergeant Schultz's March 20, 2007 email to former-PBA President Boone following Plaintiff's accounting request.  (Id. at 53:9–54:6 & 83:18–21).

On June 6, 2007, Defendant, along with Annazone, brought what appear to be administrative charges against Plaintiff for violation of certain PBA by-laws.  (D.E. No. 73, Ex. G to Hastings Cert.). The charges were based, in part, on Plaintiff's OPRA request.  (Id.).  Plaintiff was subsequently removed as PBA President.  (D.E. No. 73, Ex. B to Hastings Cert. ("Serrao Dep.") at 44:11–17). Plaintiff was not disciplined in his capacity as a police officer in connection with the June 6, 2007 PBA charges.  (Def. SMF ¶ 20; Pl. Resp. SMF ¶ 20).

In or around 2009, a sergeant position became available within the FLPD, and Plaintiff had the highest score on the promotional examination.  (Serrao Cert. ¶ 21).  Shortly thereafter, Defendant filed an I.A. complaint against Plaintiff, again alleging that Plaintiff was using unlawful techniques during traffic stops—the same allegation Captain Serrao determined to be unfounded in 2007.  (Id. ¶ 22).  Serrao investigated the I.A. complaint, and although the exact resolution is unclear, Plaintiff did not face any consequences in connection with this I.A. complaint.  (Def. SMF ¶¶ 31 & 33; Pl. Resp. SMF ¶¶ 31 & 33).  In an internal memorandum dated May 19, 2009, Defendant recommended five other officers for the sergeant promotion, and wrote that he was not recommending Plaintiff because

---

the name of the complainant, and the name of the investigating officer.  (See generally I.A. Complaint Log).  The I.A. complaints were brought and investigated by various individuals, including Defendant.  (Id.).

[4]     Defendant appears to inadvertently note "April 4, 2017" as the date Plaintiff became President of the PBA.

he believed Plaintiff was "not ready to hold a Supervisory position" and was "using [p]olicing tactics that are legally questionable."  (D.E. No. 73, Ex. H to Hastings Cert.).  Nonetheless, Plaintiff was ultimately promoted to sergeant.  (Def. SMF ¶ 35; Pl. Resp. SMF ¶ 35).

In 2010, the FLPD discovered that Sergeant Schultz had instructed a civilian to transport explosive material to the FLPD and attempted to diffuse the explosive using instructions he found on the internet, for which he became the subject of a separate I.A. investigation.  (Serrao Cert. ¶ 32). Defendant overheard Plaintiff say, "I would be fired if I did what Schultz did," which Plaintiff acknowledges saying.  (*Id.*; *see also* Def. SMF ¶ 36; Pl. Resp. SMF ¶ 36).  Defendant then informed Sergeant Schultz of Plaintiff's comment.  (Serrao Cert. ¶ 32).  According to Plaintiff, Defendant "prodded" then-Chief Eric Rose to open an investigation into Plaintiff in connection with this comment.  (Def. SMF ¶ 37; Pl. Resp. SMF ¶ 37; Corcoran Dep. at 135:15–18).  According to Captain Serrao, Defendant instructed Sergeant Schultz to file an I.A. complaint against Plaintiff.  (Serrao Cert. ¶ 32).  On February 3, 2010, Sergeant Schultz filed an I.A. complaint against Plaintiff, labeled under case number 10-01841, in connection with Plaintiff's comment based on "harassment."  (I.A. Complaint Log at 33).  The I.A. complaint was ultimately determined to be "not sustained."  (*Id.*).

On May 26, 2011, a civilian filed an I.A. complaint against Plaintiff, labeled under case number 11-07721, for allegedly falsely towing vehicles.  (Def. SMF ¶ 49; Pl. Resp. SMF ¶ 49; I.A. Complaint Log at 34; Corcoran Dep. at 164:15–22).  According to the I.A. Complaint Log, Defendant investigated the I.A. complaint.  (I.A. Complaint Log at 34).  Video evidence showed that there was no merit to the civilian's complaint.  (Corcoran Dep. at 165:6–12).  Plaintiff was ultimately "exonerated," meaning he "was justified in his actions."  (I.A. Complaint Log at 34; Cauwels Dep. at 140:20–22).  Defendant said to Plaintiff, as well as to others throughout the FLPD, statements to the effect that if not for the video, Plaintiff "would have got in trouble."  (D.E. No. 73, Ex. D to Hastings Cert. ("Flax Dep.") at 52:9–19; Corcoran Dep. at 280:11–281:2).

In 2013, Defendant was promoted to Chief, and Plaintiff was promoted to Lieutenant (Pl. Supp. SMF ¶¶ 62 & 64; Def. Resp. Supp. SMF ¶¶ 62 & 64).

On November 10, 2014, FLPD dispatcher Robert Luscombe brought an I.A. complaint against Plaintiff, labeled under case number 14-19841, for allegedly creating a hostile work environment. (I.A. Complaint Log at 37; D.E. No. 69-4, Ex. 4 to Vinhal Cert. ("Pl. Interrog. Resp.") at 9). Captain Ron Patterson investigated and interviewed Plaintiff in connection with this I.A. complaint. (I.A. Complaint Log at 37; Pl. Interrog. Resp. at 9). Plaintiff was ultimately "exonerated." (I.A. Complaint Log at 37). During the investigation, Captain Patterson interviewed Plaintiff, and Plaintiff obtained permission to record the interview with a handheld recorder. (Pl. Interrog. Resp. at 9). Defendant testified that he gave Captain Patterson permission to seize the recorder. (Cauwels Dep. at 186:10–12). Defendant was subsequently advised to return the recorder to Plaintiff, and Defendant did so. (*Id.* at 187:2–6).

In 2015, Plaintiff filed what appears to be an internal complaint against Defendant for hostile work environment. (Def. SMF ¶¶ 117–18; Pl. Resp. SMF ¶¶ 117–18; Corcoran Dep. at 237:11–13). In an email dated February 22, 2015, Plaintiff detailed numerous instances, starting in 2001, which he felt constituted "workplace harassment." (D.E. No. 69-5, Ex. 9 to Vinhal Cert. at 101–06). For example, Plaintiff described an instance in 2004 where Defendant was "informing other patrol supervisors" that Plaintiff "was illegally searching vehicles" even though Defendant "never requested to ride with [Plaintiff] to observe firsthand the techniques and tactics" he used, and Plaintiff had "never received notification from the Bergen County Prosecutors office that [his] techniques or tactics were improper or illegal." (*Id.* at 102–03). The outcome of Plaintiff's hostile work environment claim is unclear.

In or around 2017, Plaintiff became eligible for promotion to captain. (Corcoran Dep. at 295:8–14). On May 5, 2017, Defendant initiated an I.A. complaint against Plaintiff, labeled under

case number 17-07649, in connection with a comment Plaintiff made to a civilian to the effect that Defendant may not be at work the next day because he liked to play golf.  (Def. SMF ¶¶ 80–81; Pl. Resp. SMF ¶¶ 80–81; I.A. Complaint Log at 40; Cauwels Dep. at 232:1–234:15).[5]  In connection with this incident, Defendant recommended a 15-day suspension for insubordination.  (Cauwels Dep. at 237:2–6).  The complaint was found "sustained" and Plaintiff was suspended for 6 days.  (Def. SMF ¶ 82; Pl. Resp. SMF ¶ 82; I.A. Complaint Log at 40; Cauwels Dep. at 237:2–238:5).  Plaintiff also received a disciplinary notice in connection with the incident that was considered a "major discipline." (Corcoran Dep. at 295:4–14).

At some point thereafter, the hiring process began for two captain positions that would become available in 2018.  (Def. SMF ¶ 86; Pl. Resp. SMF ¶ 86; Corcoran Dep. at 36:12–15; D.E. No. 69-5, Ex. 7 to Vinhal Cert. ("Van Kruiningen Dep.") at 43:11–18 & 46:1–8).  Borough Manager James Van Kruiningen was responsible for making the promotion decision.  (Def. SMF ¶ 90; Pl. Resp. SMF ¶ 90).  Plaintiff was ranked "number one" on the "promotional list" for the captain position.  (Van Kruiningen Dep. at 43:3–10).  Defendant testified that he thought Plaintiff "should not be" promoted to captain and that he did not "want" Plaintiff promoted to captain.  (Cauwels Dep. at 241:5–13 & 275:19–22).

After Van Kruiningen interviewed three candidates, including Plaintiff, he asked Defendant to provide his opinion as to each.  (Def. SMF ¶ 91; Pl. Resp. SMF ¶ 91; Cauwels Dep. at 239:12–13; Van Kruiningen Dep. at 54:9–14).  In a memorandum dated February 15, 2017, Defendant "specifically did not recommend the promotion of [Plaintiff]" and "specifically recommended" the two other candidates.  (Def. SMF ¶ 92; Pl. Resp. SMF ¶ 92; Van Kruiningen Dep. at 55:5–18; D.E. No. 69-5, Ex. 8 to Vinhal Cert. (the "Memorandum") at 97–99).

---

[5]     Although the "complainant" for this I.A. complaint is redacted from the I.A. Complaint Log, Defendant testified that he was the "complainant."  (Cauwels Dep. at 233:19–21).

Ultimately, the two other candidates were promoted, and Plaintiff was denied the promotion. (Pl. Interrog. Resp. at 10; D.E. No. 73, Ex. K to Hastings Cert.).  Van Kruiningen testified that, as far is he was aware, Defendant has only *not* recommended an individual for a promotion in one other instance, which involved a candidate who was facing a 30-day suspension.  (Van Kruiningen Dep. at 31:3–22 & 37:10–18).  Plaintiff was the only officer who was denied a promotion after ranking number one on the promotional list.  (*Id.* at 33:22–34:4).

Of the twenty I.A. complaints listed in the I.A. Complaint Log, seven are marked "sustained," three are marked "not sustained," six are marked "exonerated," three are marked "confidential," and one is marked "administratively closed."  (*See generally* I.A. Complaint Log).  The I.A. complaints relevant to this matter—those in which Defendant is listed as either the investigating officer or the complainant, and those that otherwise relate to the facts outlined above—are summarized in the chart below.  In short, Defendant is listed as either the investigating officer or the complainant in eight of the I.A. complaints, four of which are marked "sustained."  (*Id.*).

| Case Number | Date | Complainant | Type of Complaint | Disposition | Investigating Officer |
|---|---|---|---|---|---|
| 10-01841 | 2/3/2010 | Sergeant Schultz | Harassment | Not sustained | "Uttel" |
| 10-17988 | 12/14/2010 | Redacted | Other | Sustained | Defendant |
| 11-06181 | 4/28/2011 | "FLPD" | Excessive Force | Not sustained | Defendant |
| 11-07721 | 5/26/2011 | "FLPD" | Other | Exonerated | Defendant |
| 11-13688 | 9/18/2011 | "FLPD" | Other | Exonerated | Defendant |
| 14-19841 | 11/10/2014 | Luscombe | Demeanor | Exonerated | Captain Patterson |
| 15-09041 | 6/13/2015 | Defendant | Insubordination | Sustained | Captain Patterson |
| 16-01966 | 2/22/2016 | Defendant | Other | Sustained | "Kneer" |
| 16-14395 | 8/14/2016 | Defendant | Misconduct | Sustained | "Dawicki" |
| 17-07649 | 5/5/2017 | Redacted | Insubordination | Sustained | Captain Patterson |
| 17-10506 | 6/19/2017 | Defendant | "Rule" | Not sustained | "Dawicki" |

**B.  Procedural History**

On September 13, 2018, Plaintiff filed the Complaint pursuant to 42 U.S.C. § 1983, alleging that Defendant retaliated against him in violation of his First Amendment rights by failing to promote him based on his union activity, including the 2007 OPRA request.  (Compl. ¶¶ 1–56).  On October

26, 2018, Defendant moved to dismiss the Complaint, which the parties fully briefed.  (D.E. Nos. 5, 9 & 10).  On August 9, 2019, the Court denied the motion, finding that, among other things, Defendant was not entitled to qualified immunity at that time.  (D.E. No. 17 at 9–16).

The parties engaged in discovery from February 2019 through approximately July 2022.  (D.E. Nos. 12 & 63).  On June 27, 2022, the parties attended a settlement conference which was unsuccessful.  (D.E. No. 65).  On August 29, 2022, Defendant filed the instant motion for summary judgment, which has been fully briefed.  (D.E. No. 69-1 ("Mov. Br."); D.E. No. 70 ("Opp."); D.E. No. 74 ("Reply")).  Defendant argues, among other things, that he is entitled to qualified immunity.  (Mov. Br. at 20–23).  The Court is prepared to rule.

## II.     LEGAL STANDARD

Summary judgment is appropriate "if the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A genuine issue of material fact exists when—in viewing the evidence and all reasonable inferences drawn from it in the light most favorable to the nonmovant—a reasonable jury could return a verdict for the nonmoving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  An issue is "genuine" if it is supported by evidence such that a reasonable jury could return a verdict in the non-moving party's favor.  *Id.*  A fact is "material" if it "might affect the outcome of the suit under the governing law."  *Id.*

At the summary judgment stage, the Court's function is not to weigh the evidence and determine the truth of the matter, but rather to determine whether there is a genuine issue for trial.  *Id.* at 249.  The movant bears the burden of establishing that no genuine issue of material fact exists.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The burden then shifts to the nonmoving party to present evidence that a genuine issue of material fact compels a trial.  *Id.* at 324.  To meet its burden, the nonmoving party must offer specific facts that establish a genuine issue of material fact.

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986).  The non-moving party may rely on its own affidavits or on the "depositions, answers to interrogatories, and admissions on file" to designate these facts, but may not rely solely on its own pleadings.  *Celotex*, 477 U.S. at 324; *see also Williams v. Borough of W. Chester*, 891 F.2d 458, 460 (3d Cir. 1989).

## III.   DISCUSSION

The elements of a First Amendment retaliation claim are: "(1) constitutionally protected conduct, (2) retaliatory action sufficient to deter a person of ordinary firmness from exercising his constitutional rights, and (3) a causal link between the constitutionally protected conduct and the retaliatory action." *Thomas v. Indep. Twp.*, 463 F.3d 285, 296 (3d Cir. 2006).  On the instant motion for summary judgment, Defendant argues that Plaintiff cannot establish the first and third elements of his retaliation claim.  Specifically, Defendant argues that (i) he is entitled to qualified immunity because Plaintiff cannot establish that he engaged in constitutionally protected activity, and, alternatively, (ii) Plaintiff cannot establish causation between the constitutionally protected activity and the alleged retaliatory act, namely, the decision not to promote Plaintiff to captain.  (Mov. Br. at 6–19 & 20–22).  Plaintiff opposes, arguing that summary judgment should be denied because (i) Defendant has not met his burden to show entitlement to qualified immunity, and (ii) a reasonable jury could infer causation based on the record.  (Opp. at 6–19).  For the reasons that follow, the Court agrees with Plaintiff.

### A.     Qualified Immunity

Qualified immunity insulates government officials from the burdens of litigation and civil liability.  *Walter v. Pike Cnty.*, 544 F.3d 182, 190 (3d Cir. 2008).  The burden of establishing entitlement to qualified immunity rests with the movant asserting the defense.  *Halsey v. Pfeiffer*, 750 F.3d 273, 288 (3d Cir. 2014).  "The qualified immunity inquiry contains two prongs: (1) whether the facts alleged by the plaintiff show the violation of a constitutional right, and (2) whether the law was

clearly established at the time of the violation." *Jefferson v. Lias*, 21 F.4th 74, 80 (3d Cir. 2021). While both prongs are required, courts may address them in any order. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

Defendant relies on the first prong of the qualified immunity analysis—arguing that there was no constitutional violation—and does not provide any argument as to the second prong of the qualified immunity analysis. (Mov. Br. at 20–22). Specifically, Defendant argues that there was no constitutional violation because Plaintiff cannot establish the first element of his retaliation claim: whether he engaged in constitutionally protected activity. (*Id.* at 22; *see also id.* at 6–10).

The speech of a public employee is constitutionally protected when "(1) in making it, the employee spoke as a citizen, (2) the statement involved a matter of public concern, and (3) the government employer did not have 'an adequate justification for treating the employee differently from any other member of the general public' as a result of the statement he made." *Hill v. Borough of Kutztown*, 455 F.3d 225, 241–42 (3d Cir. 2006) (quoting *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006)).[6] The third element asks, in other words, whether the employee's interest in engaging in such speech outweighs the employer's interest in promoting the efficiency of the public service it performs. *Dougherty v. Sch. Dist. of Philadelphia*, 772 F.3d 979, 991 (3d Cir. 2014). Whether the employee engaged in protected speech is a question of law. *Watters v. City of Philadelphia*, 55 F.3d 886, 892 (3d Cir. 1995). "The outcome of [the] analysis is not determined by the source of the speech or the merit of its content." *Brennan v. Norton*, 350 F.3d 399, 414 (3d Cir. 2003). "Rather, the issue is whether it is important to the process of self-governance that communications on this topic, in this form and in this context, take place." *Id.* (quoting *Azzaro v. County of Allegheny*, 110 F.3d 968, 977

---

[6]     Defendant does not contest whether Plaintiff's OPRA request may generally constitute speech for purposes of the First Amendment. Indeed, speech under the First Amendment includes "the spoken or written word" as well as "conduct [that] possesses sufficient communicative elements." *Texas v. Johnson*, 491 U.S. 397, 404 (1989). Rather, Defendant contests whether the OPRA request in that case constitutes *protected* speech. (Mov. Br. at 8).

(3d Cir. 1997)).

Defendant rests his argument on the first two elements of constitutionally protected speech and does not raise any argument with respect to the third element. (Mov. Br. at 22). Specifically, Defendant argues that Plaintiff's OPRA request was not protected speech because (i) it was made in his capacity as "PBA Vice President" and thus not in his capacity as a private citizen and (ii) it "does not touch upon a matter of public concern." (*Id.*; *see also id.* at 8 & 10). Plaintiff opposes each argument, arguing that (i) because Plaintiff made the OPRA request in his capacity as a union member, such activity constitutes speech as a private citizen and (ii) because Plaintiff's OPRA request was made pursuant to his concern regarding misappropriation of donated funds, his speech involved a matter of public concern. (Opp. at 6–10). Plaintiff also notes that the Court previously addressed the legal questions at issue in determining that Plaintiff had plausibly pled a constitutional violation. (*See id.* at 6). Specifically, the Court noted that union activities are generally considered protected acts of a private citizen, and that "wrongdoing by police officers in any capacity" is a matter of public concern. *See Corcoran v. Cauwels*, No. 18-13875, 2019 WL 3774591, at *6–8 (D.N.J. Aug. 9, 2019). In his reply brief, Defendant does not respond to Plaintiff's position as to the first element—whether Plaintiff spoke as a private citizen—but only focuses on the second element—whether Plaintiff's speech involved a matter of public concern—reiterating his position that Plaintiff's OPRA request, specifically as it pertained to Defendant's emails, did not involve a matter of public concern because Plaintiff has not shown that Defendant actually engaged in misappropriation of funds. (Reply at 13–14).

### a. Private Citizen

As previously noted, whether an employee spoke as a private citizen is a question of law. *See Watters*, 55 F.3d at 892. A public employee does not speak as a private citizen when the statement is made "pursuant to their official duties." *Palardy v. Twp. of Millburn*, 906 F.3d 76, 81 (3d Cir. 2018)

(quoting *Garcetti*, 547 U.S. at 421), *cert. denied*, 139 S. Ct. 2011 (2019).  A statement "pursuant to" one's official duties does not merely concern those duties but is part of a public employee's "ordinary job responsibilities." *Flora v. Cnty. of Luzerne*, 776 F.3d 169, 178 (3d Cir. 2015) (quoting *Lane v. Franks*, 573 U.S. 228, 237 (2014)).  In other words, a public employee speaks as a private citizen when making a statement that is not part of "the tasks he was paid to perform." *Id.* (quoting *Lane*, 573 U.S. at 239); *see also Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*, 138 S. Ct. 2448, 2471 (2018) ("[E]mployee speech is largely unprotected if it is part of what the employee is paid to do.").

The Third Circuit has held that union membership is a protected activity—in other words, that it is not a part of a public employee's ordinary job responsibilities but is undertaken by a public employee as a private citizen.  *Palardy*, 906 F.3d at 84 ("union membership is worthy of constitutional protection"); *see also id.* at 83 ("it is hard to imagine a situation where a public employee's membership in a union would be one of his 'official duties'") (quoting *Garcetti*, 547 U.S. at 421). Although it appears that the Third Circuit has not explicitly determined whether union speech—as opposed to union membership—is categorically protected or unprotected, other Courts of Appeals have used similar reasoning to establish a bright-line rule that union activities, including speech, are protected from retaliation under the First Amendment.[7] *See, e.g.*, *Boulton v. Swanson*, 795 F.3d 526, 534 (6th Cir. 2015) (holding that speech in connection with union activities is made "as a citizen" because job responsibilities do not include acting as a union member); *Swetlik v. Crawford*, 738 F.3d 818, 826 (7th Cir. 2013) (holding that statements made as a union representative are not part of official police duties and thus are afforded First Amendment protection); *Ellins v. City of Sierra Madre*, 710 F.3d 1049, 1060 (9th Cir. 2013) ("Given the inherent institutional conflict of interest between an

---

[7]        When the Third Circuit has not yet addressed a right asserted by a plaintiff, a district court "routinely considers decisions by other Courts of Appeals." *Schmidt v. Creedon*, 639 F.3d 587, 598 (3d Cir. 2011) (quoting *Williams v. Bitner*, 455 F.3d 186, 192–93 (3d Cir. 2006)).

employer and its employees' union, we conclude that a police officer does not act in furtherance of his public duties when speaking as a representative of the police union."); *Corcoran*, 2019 WL 3774591, at \*6 (collecting cases).

Defendant argues that Plaintiff did not speak as a private citizen because he made the OPRA request pursuant to his "official duties" as Vice President of the PBA.  (Mov. Br. at 8).  Thus, Defendant's argument appears to overlook the caselaw, as previously outlined by the Court, that considers speech in connection with union activities to be protected under the First Amendment.  *See Corcoran*, 2019 WL 3774591, at \*6.  Here, the record suggests, and Defendant does not dispute, that Plaintiff made the OPRA request while he was acting as PBA Vice President.  (Def. SMF ¶¶ 3–4 & 8; Pl. Resp. SMF ¶ 3–4 & 8; Corcoran Dep. at 68:5–13).  Further, the record suggests, and Defendant does not dispute, that Plaintiff only came to suspect the misappropriation of funds through his involvement with the PBA.  (Def. SMF ¶ 13; Pl. Resp. SMF ¶ 13).  Therefore, the record supports Plaintiff's position that he acted in his capacity as a union member when he made the OPRA request, and thus was acting as a private citizen.  *See, e.g.*, *Flora*, 776 F.3d at 178; *Boulton*, 795 F.3d at 534; *Watters*, 55 F.3d at 892.

### b.    Public Concern

As previously noted, whether a statement addresses a matter of public concern is a question of law.  *See Watters*, 55 F.3d at 892; *see also Curinga v. City of Clairton*, 357 F.3d 305, 310 (3d Cir. 2004).  There is no bright-line rule dictating whether speech is a matter of public concern.  *Montone v. City of Jersey City*, 709 F.3d 181, 194 (3d Cir. 2013).  Rather, the Court must engage in a "case-and fact-specific inquiry" in making this determination.  *Id.*

"An employee's speech addresses a matter of public concern when it can be 'fairly considered as relating to any matter of political, social, or other concern to the community.'"  *Holder v. City of Allentown*, 987 F.2d 188, 195 (3d Cir. 1993) (quoting *Connick v. Myers*, 461 U.S. 138, 147 (1983)).

A court conducts a public-concern inquiry by examining the "content, form, and context" of the speech. *Id.* (quoting *Connick*, 461 U.S. at 147–48). In making this determination, no single factor is dispositive, and the court must examine the entire record. *Snyder v. Phelps*, 562 U.S. 443, 453–54 (2011); *see also Zamboni v. Stamler*, 847 F.2d 73, 78 (3d Cir. 1988) ("'[c]omplete reliance' on the employee's motivation in speaking is inappropriate") (quoting *Rode v. Dellarciprete*, 845 F.2d 1195, 1201 (3d Cir. 1988)). The content of speech may be a matter of public concern if it is "a subject of legitimate news interests" that addresses a subject of general interest and concern to the public. *Snyder*, 562 U.S. at 453 (quoting *City of San Diego v. Roe*, 543 U.S. 77, 83–84 (2004)). For example, a public employee's speech addresses a matter of public concern if it "seeks to 'bring to light actual or potential wrongdoing or breach of public trust' on the part of government officials." *Holder*, 987 F.2d at 195 (quoting *Connick*, 461 U.S. at 148). Under this framework, the Third Circuit has found a public employee's criticism of internal office operations to be a matter of public concern. *Zamboni*, 847 F.2d at 77; *see also Lane*, 573 U.S. at 240 ("[S]peech by public employees on subject matter related to their employment holds special value precisely because those employees gain knowledge of matters of public concern through their employment."). Likewise, some union activities—for example, criticism of management—may address matters of public concern. *Thomas v. Del. State Univ.*, 626 F. App'x 384, 388 (3d Cir. 2015); *accord Clue v. Johnson*, 179 F.3d 57, 61 (2d Cir. 1999).

The record supports Plaintiff's position that his OPRA request sought to determine if donated funds were being misappropriated. (Opp. at 8–10). To start, Defendant does not dispute that Plaintiff came to suspect that Lt. Yirce was misappropriating PBA funds allocated for a Police Unity Tour charity bicycle ride. (Def. SMF ¶ 4; Pl. Resp. SMF ¶ 4). Defendant also does not dispute that Plaintiff became concerned after he learned that other police union treasurers in New Jersey were being "charged" with "improper disposition of donated funds." (Pl. Supp. SMF ¶ 9; Def. Resp. Supp. SMF ¶ 9). Finally, Defendant does not dispute that "[a]s a result" of these concerns, "Plaintiff believe[d]

that the PBA needed to ensure that its members were keeping a proper accounting of all solicited funds." (Pl. Supp. SMF ¶ 10; Def. Resp. Supp. SMF ¶ 10).  In addition, Plaintiff testified that he "felt that we needed to ensure that members of our police department and [union] were accounting for anything we were soliciting" and "making proper disposition of funds." (Corcoran Dep. at 45:17–46:10).  Plaintiff testified that he included Defendant and Annazone in the request because they were SOA representatives for Lt. Yirce and Sergeant Shultz. (Def. SMF ¶ 9; Pl. Resp. SMF ¶ 9; Corcoran Dep. at 63:19–64:6 & 66:14–22).  Plaintiff further testified that he made the OPRA request because he "wanted to find out what was being discussed, what was going on and why [Sergeant Schultz was] so secretive" and "resistant to provid[ing] information." (Corcoran Dep. at 65:22–66:13).  Further, Captain Serrao testified that many members of the PBA had become concerned with how the funds were being used, and "wanted to know where that money was going." (Serrao Dep. at 27:21–28:13, 30:12–17, 32:13–18 & 40:15–21).  Accordingly, insofar as Plaintiff's OPRA request sought to bring to light potential wrongdoing by public officials, the record supports Plaintiff's position that his speech involved a matter of public concern. *See Watters*, 55 F.3d at 892.

Defendant's arguments do not lead to a contrary conclusion.  While Defendant argues that the OPRA request did not involve a matter of public concern because Plaintiff has not shown that Defendant actually engaged in misappropriation of funds (Reply at 13–14), the law does not require Plaintiff to prove the "merits" of the speech. *See Brennan*, 350 F.3d at 414.  Defendant further argues that Plaintiff's OPRA request did not involve a matter of public concern because it sought information regarding funds raised for the Police Unity Tour, and the Police Unity Tour "does not affect the public, as these are not public funds at issue." (Mov. Br. at 10).  The Court notes that it addressed and rejected this argument on Defendant's motion to dismiss the Complaint. *See Corcoran*, 2019 WL 3774591, at *7.  As set forth above, the record shows that Plaintiff made the OPRA request in connection with his concern that police officers were misappropriating funds for personal gain.  And, as the Court

16

previously noted, members of the public would be interested to learn of corruption or other "wrongdoing by police officers in any capacity." *See id.* (citing *Baldassare v. New Jersey*, 250 F.3d 188, 198 (3d Cir. 2001)).

In sum, Plaintiff has established the first two elements of protected speech—specifically, that his OPRA request was made in his capacity as a private citizen and involved a matter of public concern. As previously noted, Defendant does not present any argument as to the third element of protected speech—whether Plaintiff's interest in engaging in such speech outweighs the FLPD's interest in promoting the efficiency of the public service it performs. *See Dougherty*, 772 F.3d at 991. As such, the Court deems the argument waived. The Court notes that the Third Circuit has consistently held, with respect to the third element, that "the public's interest in exposing potential wrongdoing by public employees is especially powerful," and, to outweigh such interest, the employer "bear[s] a truly heavy burden." *See id.* (first quoting *Baldassare*, 250 F.3d at 198, then quoting *McGreevy v. Stroup*, 413 F.3d 359, 365 (3d Cir. 2005)).

Because Defendant relies on his position that Plaintiff's speech was not constitutionally protected to argue that there was no constitutional violation for purposes of qualified immunity (Mov. Br. at 22), it therefore follows that Defendant has not met his burden of establishing that he is entitled to summary judgment as a matter of law with respect to qualified immunity. Accordingly, Defendant's motion for summary judgment as to qualified immunity must be **DENIED**.[8]

**B.    Causation**

Defendant alternatively argues that Plaintiff has not presented sufficient evidence to support an inference of causation, the third element of Plaintiff's retaliation claim. (Mov. Br. at 12–15). In

---

[8]      Defendant appears to further argue that he is entitled to qualified immunity because he "was not responsible for Plaintiff[']s failure to be promoted to Captain in 2018, as the Chief of Police does not have authority over promotions." (Mov. Br. at 22). Because this argument appears to speak to the causation element of Defendant's retaliation claim, rather than any element of qualified immunity, the Court does not address it here. The Court addresses Defendant's causation argument in Section III.B., below.

response, Plaintiff argues that genuine issues of material fact exist as to causation that must be decided by a jury.  (Opp. at 10–16).  For the following reasons, the Court agrees with Plaintiff.

The Third Circuit has consistently held that the causation element of a First Amendment retaliation claim is "a question of fact for the jury."  *Falco v. Zimmer*, 767 F. App'x 288, 310 (3d Cir. 2019) (quoting *McGreevy*, 413 F.3d at 364); *see also Green v. Philadelphia Hous. Auth.*, 105 F.3d 882, 889 (3d Cir. 1997), *as amended* (Mar. 13, 1997).  The plaintiff has the initial burden of showing that his constitutionally protected conduct was a "substantial" or "motivating factor" in the allegedly retaliatory decision.  *Suppan v. Dadonna*, 203 F.3d 228, 235 (3d Cir. 2000) (citing *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)); *see also Conard v. Pa. State Police*, 902 F.3d 178, 184 (3d Cir. 2018).  "Once the plaintiff carries this burden, the burden shifts to the defendant to show 'by a preponderance of the evidence that it would have reached the same decision even in the absence of the protected conduct.'"  *Suppan*, 203 F.3d at 235 (quoting *Mount Healthy*, 429 U.S. at 287).  Each step of the causation inquiry involves questions of fact that "should be submitted to the jury."  *Watters*, 55 F.3d at 892 n.3 (quoting *Johnson v. Lincoln University*, 776 F.2d 443, 454 (3d Cir. 1985)).

"To establish the requisite causal connection a plaintiff usually must prove either (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link."  *Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007).  "In the absence of that proof the plaintiff must show that from the 'evidence gleaned from the record as a whole' the trier of the fact should infer causation."  *Id.* (quoting *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 281 (3d Cir. 2000)).  A wide temporal gap can be narrowed by evidence that suggests a "pattern of antagonism."  *See Conard*, 902 F.3d at 184–85 (quoting *Watson v. Rozum*, 834 F.3d 417, 422 (3d Cir. 2016)) (holding that there is no bright-line rule regarding proximity and allowing complaint to survive a

18

motion to dismiss despite a nearly nine-year gap between the alleged protected conduct and retaliation).

Plaintiff argues that he can establish causation "either through the unduly suggestive timeline of events beginning with Plaintiff's OPRA request in 2007 and concluding with Plaintiff being denied the promotion to [c]aptain in 2018, or through Defendant's retaliatory animus towards Plaintiff which was quite obviously triggered following Plaintiff's OPRA request." (Opp. at 16). Plaintiff further argues that "[a]t the very least, there is a dispute of fact that must be decided by a jury." (*Id.*). To support his position, Plaintiff points to several pieces of evidence in the record. (*Id.* at 12–16). To start, Plaintiff points to evidence, including the testimony of Plaintiff, as well as Captain Serrao and Andrew Flax, an FLPD telecommunicator at the time, that suggests Plaintiff and Defendant's relationship became strained following Plaintiff's OPRA request. (*Id.* at 12; Serrao Cert. ¶¶ 8–9; Corcoran Dep. at 92:18–93:6; Flax Dep. at 39:24–44:4). Indeed, Plaintiff testified that his relationship with Defendant "changed" after he submitted the OPRA request, and that Defendant treated him like he "didn't exist." (Corcoran Dep. at 92:18–93:6). According to Captain Serrao, "[i]t was well[-] known throughout the Department" that Defendant "had it out for [Plaintiff] following his OPRA request." (Serrao Dep. at 37:24–38:2). Defendant "took exception with [Plaintiff's] request and was vocal within the Department about the same." (Serrao Cert. ¶ 8). Flax testified that Defendant "[b]asically . . . ignore[ed]" Plaintiff following the OPRA request. (D.E. No. 73, Ex. C to Hastings Cert. ("Flax Cert.") at ¶ 1; Flax Dep. at 39:24–44:4).

Next, Plaintiff points to at least ten specific instances in the record that he argues "culminated in Plaintiff being denied a promotion to [c]aptain." (Opp. at 12–16). First, Plaintiff points to the June 2007 PBA charge that Defendant, among others, filed against Plaintiff, which was based in part on Plaintiff's OPRA request. (*Id.* at 12; D.E. No. 73, Ex. G to Hastings Cert.). The PBA charge provides that the OPRA request was made "without any fact to believe that" the individuals whose emails

Plaintiff sought "ha[d] done anything wrong" and that the request "violate[s] both their privacy interests and would send a chilling message to the members of their collective bargaining unit with regards to grievance processing as well as collective negotiations." (D.E. No. 73, Ex. G to Hastings Cert.). The PBA charge further provides that Plaintiff's OPRA request "impl[ied] that the SOA Officers were involved in improper activity." (*Id.*). Finally, the PBA charge references Plaintiff's "motherfuckers" comment made during the April 4, 2007 meeting, describing the comment as "hardly . . . befitting a PBA President." (*Id.*).

Second, Plaintiff points to evidence regarding the 2007 I.A. complaint Defendant filed against Plaintiff, shortly after he made the OPRA request, for allegedly using "unlawful techniques during traffic stops." (Opp. at 12–13; Serrao Cert. ¶ 14; Cauwels Dep. at 38:2–10). As Plaintiff argues, Captain Serrao determined that the I.A. complaint was unfounded because it was comprised of general allegations and lacked legal support, and he confirmed his finding with the Bergen County Prosecutor's Office. (Opp. at 12–13; Serrao Cert. ¶¶ 16–18). The Court additionally notes that when Captain Serrao informed Defendant of his finding that Plaintiff was acting within his authority, Defendant "argue[d]" with him, but was still unable to provide any factual or legal support for the complaint. (Serrao Cert. ¶ 16). According to Captain Serrao, despite explaining his findings to Defendant, Defendant continued to "question anything [Plaintiff] did." (*Id.* ¶ 20).

Third, Plaintiff points to Defendant's 2009 recommendation that Plaintiff not be promoted to sergeant because he was "using [p]olicing tactics that [were] legally questionable"—although Plaintiff scored the highest on the promotional examination. (Opp. at 13; Serrao Cert. ¶ 21; D.E. No. 73, Ex. H to Hastings Cert.). The Court additionally notes that Plaintiff was ultimately promoted to sergeant. (Def. SMF ¶ 35; Pl. Resp. SMF ¶ 35). Fourth, Plaintiff points to Defendant's 2009 I.A. complaint against Plaintiff, for which Plaintiff did not face consequences, alleging that he was using the same techniques that Captain Serrao had found to be lawful in 2007. (Opp. at 13; Serrao Cert. ¶

22; Def. SMF ¶ 33; Pl. Resp. SMF ¶ 33).  The Court notes that Serrao testified that other officers were employing the same techniques Defendant complained of, but no other officer was the subject of the I.A. complaint.  (Serrao Cert. ¶ 23).

Fifth, Plaintiff points to the 2010 incident in which Schultz instructed a civilian to transport explosive material to the FLPD and Defendant overheard Plaintiff say, "I would be fired if I did what Schultz did."  (Opp. at 13; Serrao Cert. ¶ 32).  The record suggests that Defendant either "prodded" Chief Rose to open an investigation in connection with Plaintiff's comment (Def. SMF ¶ 37; Pl. Resp. SMF ¶ 37; Corcoran Dep. at 133:20–135:18), or that Defendant instructed Sergeant Schultz to file the I.A. complaint labeled under case number 10-01841 (Serrao Cert. ¶ 32), which was determined to be "not sustained."  (I.A. Complaint Log at 33).

Sixth, Plaintiff points to Defendant's comments following the 2011 civilian I.A. complaint, labeled under case number 11-07721, for allegedly falsely towing vehicles, where video evidence exonerated Plaintiff.  (Opp. at 14; I.A. Complaint Log at 34).  Specifically, Defendant told Plaintiff that "had it not been for the video . . . [Defendant] would have no choice but to find [the complaint] sustained."  (Corcoran Dep. at 280:11–281:2).  In addition, Flax testified that "throughout the department, it was said" that Defendant said something to the effect that if not for the video, Plaintiff "would have got in trouble."  (Flax Dep. at 52:9–19).

Seventh, Plaintiff points to evidence surrounding dispatcher Luscombe's 2014 I.A. complaint, labeled under case number 14-19841, for allegedly creating a hostile work environment, of which Plaintiff was ultimately exonerated.  (Opp. at 14; I.A. Complaint Log at 37; Pl. Interrog. Resp. at 9).  Plaintiff points to his interrogatory response in which he states that Defendant "initiated and/or approved" of the 2014 I.A. complaint.  (Pl. Interrog. Resp. at 9).  During the investigation, Captain Patterson interviewed Plaintiff, and Plaintiff obtained permission to record the interview with a handheld recorder.  (*Id.*).  Defendant testified that Captain Patterson seized the recorder with his

"permission"—although the context of the conversation between Defendant and Captain Patterson, including whether Captain Patterson sought such permission, is unclear.  (Cauwels Dep. at 186:10–12).  According to Defendant, he provided such permission following "a conversation between [him] and Captain Patterson" regarding "the integrity of the investigation" and how it "would be compromised if other people [who] still had to be interviewed were able to listen to that tape."  (*Id.* at 181:20–24).  Defendant was advised to return the recorder to Plaintiff, although the record is unclear as to who he was advised by.  (*Id.* at 187:2–6).  Defendant returned the recorder to Plaintiff. (*Id.* at 187:5–6).

Eighth, Plaintiff points to evidence surrounding the 2017 incident, which occurred around the time Plaintiff became eligible for promotion to captain, in connection with a comment Plaintiff made to a civilian to the effect that Defendant may not be at work the next day because he liked to play golf.  (Opp. at 15; I.A. Complaint Log at 40; Corcoran Dep. at 238:21–23; Cauwels Dep. at 232:1–234:15).  Defendant testified that he initiated an I.A. complaint, labeled under 17-07649, in connection with the comment.  (Def. SMF ¶ 82; Pl. Resp. SMF ¶ 82; I.A. Complaint Log at 40; Cauwels Dep. at 232:1–234:15).  The I.A. complaint was sustained, and Defendant recommended a 15-day suspension for insubordination, which was ultimately reduced to a 6-day suspension by a hearing officer.  (Def. SMF ¶ 82; Pl. Resp. SMF ¶ 82; I.A. Complaint Log at 40; Cauwels Dep. at 237:2–238:5).  Plaintiff received a disciplinary notice in connection with the incident that was considered a "major discipline."  (Corcoran Dep. at 295:4–14).  In comparison, according to Flax, Detective Steve Cannici had said that Defendant was "probably out golfing" while in the presence of "the Mayor and Borough Manager" and "joked about this to [Defendant] and others in the Department . . . on several occasions" and was not disciplined.  (Flax Cert. ¶ 5).

Ninth, Plaintiff points to evidence surrounding the hiring process for the two vacant captain positions in or around 2017.  (Opp. at 15).  Specifically, Plaintiff was ranked "number one" on the

"promotional list" for the captain position.  (Van Kruiningen Dep. at 43:3–10).  According to Plaintiff, only he and one other individual intended to apply for the two available positions, but Defendant asked a third individual to also apply for the promotion.  (Pl. Interrog. Resp. at 10).  The third individual did apply for and ultimately received the promotion.  (*Id.*).

Tenth, Plaintiff points to the February 15, 2017 Memorandum, in which Defendant "specifically did not recommend the promotion of [Plaintiff]."  (Opp. at 16; Def. SMF ¶ 92; Pl. Resp. SMF ¶ 92; Memorandum at 97–99; Van Kruiningen Dep. at 55:5–18).  Defendant wrote that Plaintiff "has been involved in approximately (27) Internal Affairs Investigations," asking "what kind of message would it send to officers and the public, if the officer who has the most internal affairs complaints against him is now conducting investigations against other officers?"  (Memorandum at 98).  Defendant detailed certain I.A. complaints against Plaintiff—specifically, one from 2010 for "Other Rule Violation," one from 2012 for "demeanor," and one from 2013, also for "demeanor," all of which were "sustained."  (*Id.*; I.A. Complaint Log at 33 & 35–36).  Defendant wrote that Plaintiff is "insubordinate," "disrespectful," and "has failed to show the positive examples of leadership."  (Memorandum at 99).  Finally, Defendant wrote that if Plaintiff were promoted, officers would believe that "all you have to do is score high on a promotional exam and you will be promoted."  (*Id.*).

The Court notes that, after Van Kruiningen received the Memorandum, he discussed his decision with Defendant.  (Van Kruiningen Dep. at 77:16–20).  Van Kruiningen testified that, as far is he was aware, Defendant has only *not* recommended an individual for a promotion in one other instance, which involved a candidate who was facing a 30-day suspension.  (*Id.* at 31:3–22 & 37:10–18).  Additionally, as far is he was aware, Plaintiff was the only officer who was denied a promotion after ranking number one on the promotional list.  (*Id.* at 33:20–34:4).  Additionally, Defendant testified that he thought Plaintiff "should not be" promoted to captain and that he did not "want" Plaintiff promoted to captain.  (Cauwels Dep. at 241:5–13 & 275:19–22).

Taken together and viewed in a light most favorable to Plaintiff, the Court finds that Plaintiff has sufficiently shown that the "evidence gleaned from the record as a whole" could lead the trier of the fact to find a "pattern of antagonism" sufficient to infer causation between the OPRA request and the decision not to promote Plaintiff to captain.  *See Lauren W. ex rel. Jean W.*, 480 F.3d at 267; *see also Conard*, 902 F.3d at 184–85; *Mrazek v. Stafford Twp.*, No. 13-1091, 2016 WL 5417197, at *12 (D.N.J. Sept. 28, 2016), *aff'd sub nom. Smith McVey v. Twp. of Stafford*, 704 F. App'x 114 (3d Cir. 2017) (finding plaintiff met his burden with respect to causation on summary judgment where the record suggested that the defendant improperly influenced the promotion process based on the plaintiff's union activity).  While Defendant contests the significance of some of this evidence (Mov. Br. at 13), the Court's function at the summary judgment stage is not to weigh the evidence, but rather to determine whether there is a genuine issue for trial.  *See Anderson*, 477 U.S. at 248.  And here, the parties' dispute turns on whether a jury *could* infer causation based on the record before the Court.

Defendant's remaining arguments do not lead to a contrary conclusion.   Specifically, Defendant argues that Plaintiff has not presented sufficient evidence to give rise to an inference of causation.   In particular, Defendant points to eight I.A. complaints from the I.A. Complaint Log. (Mov. Br. at 13).   Defendant appears to represent that Plaintiff relies on these I.A. complaints and argues that none of them show that Defendant retaliated against Plaintiff because they were either sustained or did not involve Defendant.  (*Id.* at 13–17).  However, as outlined above, Plaintiff does not rely on any single I.A. complaint to infer causation, but rather points to various evidence to argue that an inference of causation may be gleaned from the record as a whole.  In fact, Plaintiff's argument involves only three of the I.A. complaints Defendant lists: (i) the 2010 I.A. complaint, labeled under case number 10-01841, filed by Sergeant Schultz in connection with his comment that he "would be fired if [he] did what Schultz did," (ii) the 2011 civilian I.A. complaint, labeled under case number 11-07721, for allegedly falsely towing vehicles, and (iii) the 2017 I.A. complaint, labeled under case

24

number 17-07649, which Defendant initiated against Plaintiff in connection with his comment that Defendant may not be at work the next day because he liked to play golf.  And, as also outlined above, the record contains evidence, including evidence surrounding the above-mentioned I.A. complaints, that, when viewed as a whole, may lead a reasonable jury to find a pattern of antagonism sufficient to infer causation.

Defendant additionally points to Plaintiff's 2015 internal complaint against Defendant for hostile work environment as "further evidence that there is no causal link" between Plaintiff's 2007 OPRA request and the decision not to promote him.  (Mov. Br. at 15; Reply at 3–4).  Defendant specifically argues that Plaintiff's basis for the 2015 internal complaint included instances of "retaliation" that occurred prior to his 2007 OPRA request, and thus, according to Defendant, "Plaintiff's allegations regarding a pattern of retaliation have no merit and no causal link exists." (Mov. Br. at 15).  As previously noted, causation is generally a question appropriate for a jury, and the parties shall each have an opportunity to present their competing arguments at trial.  *See, e.g.*, *Falco*, 767 F. App'x at 310.

Therefore, Plaintiff has met his initial burden of demonstrating that sufficient record evidence exists for a jury to find that there was a pattern of antagonism, and thus to infer causation.

In the next step of the analysis, Defendant may show by a preponderance of the evidence that the same decision not to promote Plaintiff would have been reached even in the absence of the constitutionally protected activity.  *See Suppan*, 203 F.3d at 235.  For the following reasons, the Court finds that the inquiry here involves factual disputes for a jury.  *See Watters*, 55 F.3d at 892 n.3

To argue that Plaintiff would not have been promoted even if he had not made the OPRA request, Defendant primarily relies on the fact that he was not responsible for the promotion decision, and that Van Kruiningen, as the Borough Manager, had sole authority regarding the promotion decision.  (Mov. Br. at 16–17).  He further argues that Van Kruiningen testified that had Defendant

not provided him with the February 15, 2017 Memorandum, in which he did not recommend Plaintiff for the promotion, Van Kruiningen still would not have promoted Plaintiff based upon certain unsatisfactory responses in his interview.  (*Id.* at 17).  In response, Plaintiff argues that a dispute of fact exists because Van Kruiningen offered conflicting testimony as to whether he would have promoted Plaintiff absent Defendant's Memorandum, and thus his testimony raises a credibility issue for a jury.  (Opp. at 17–18).  According to Plaintiff, the Memorandum "completely influenced" Van Kruiningen's decision not to promote him.  (*Id.* at 18).  In his reply brief, Defendant does not address the conflicting testimony to which Plaintiff points, but argues that even if Van Kruiningen's decision was based solely on the Memorandum, "there is no evidence that the [M]emorandum itself was written by [Defendant] in retaliation for the alleged protected act occurring 11 years prior."  (Reply 10–12).

The Third Circuit in *Suppan* explained that the burden of showing that the same decision would have been reached in the absence of the constitutionally protected activity may be carried by demonstrating that:

> (1) a fair evaluation by [the plaintiff's] superiors—i.e., one in which retaliation played no role, would have ranked the plaintiff[] sufficiently low on the list that they would not be contenders for any promotions that would be made; or
>
> (2) a fair evaluation by those supervisors would have resulted in the same decision . . . not to promote anyone; or
>
> (3) assuming promotions would have been made, a fair evaluation by those supervisors would have resulted in the . . . [selection of] other contenders.

*Suppan*, 203 F.3d at 237.

With the framework set forth in *Suppan* in mind, the relevant question as applied to this case appears to be whether "a fair evaluation"—in other words, an evaluation made in the absence of the OPRA request—would have resulted in Van Kruiningen making the same decision not to promote

Plaintiff.  However, Defendant has failed to set forth a comprehensive argument under the *Suppan* framework or otherwise point to evidence that would tend to show that "a fair evaluation" would have resulted in the same promotion decision.  Defendant does not argue that the Memorandum constituted a "fair evaluation" not influenced by Plaintiff's OPRA request, as that conclusion is tied up in the parties' dispute regarding whether the record demonstrates a pattern of antagonism.  Defendant does not argue that he would still have written the Memorandum even if Plaintiff had not made the OPRA request.  Defendant merely states that he "provided reasons for his opinion" in the Memorandum and argues that even if Plaintiff meets his burden to show causation, the Memorandum did not affect Van Kruiningen's decision not to promote Plaintiff.  (Mov. Br. at 16–17).

Even accepting Defendant's reliance on Van Kruiningen's testimony that the Memorandum did not affect his decision, summary judgment would still be inappropriate because, consistent with Plaintiff's position, Van Kruiningen's testimony appears contradictory.  For example, Van Kruiningen testified that he took Defendant's Memorandum into consideration, but that he would have made the same decision without it based on certain unsatisfactory responses Plaintiff provided during his interview.  (Van Kruiningen Dep. at 56:10–22).  However, he also testified that in making the promotion decision, he was conscious of the fact that Defendant would have to work with the individual he promoted to captain "on a day-to-day basis."  (*Id.* at 82:2–9).  He further testified that if Defendant had recommended Plaintiff for the promotion, he would have taken the recommendation into consideration, and that each individual who Defendant has recommended for a promotion in the past has been promoted.  (*Id.* at 38:3–5 & 81:4–82:9).  Defendant does not address this testimony and relies instead on his position that the Memorandum was not written in retaliation—a conclusion which, as previously discussed, is precluded at this juncture by factual issues.

Thus, the parties dispute whether Defendant's Memorandum influenced the decision not to promote Plaintiff.  As such, whether the same promotion decision would have been reached in the

27

absence of the protected activity is a question for the jury.  *See Watters*, 55 F.3d at 892 n.3; *see also Mrazek*, 2016 WL 5417197, at *12 (denying summary judgment where defendant failed to set forth any argument in accordance with the burden-shifting framework set forth in *Suppan*, and explaining that, even if defendant had done so, relevant factual disputes precluded summary judgment).

### C.    Individual Liability

Lastly, Defendant argues that Plaintiff "cannot establish that [Defendant] played an 'affirmative part' in the decision not to promote Plaintiff to Captain in 2018" and so he cannot be held liable for that decision.  (Mov. Br. at 18–19).[9]  Specifically, on the instant motion for summary judgment, Defendant argues that he is not individually liable because Plaintiff "failed to plead" that the OPRA request was a "substantial or motivating factor in the decision not to promote him," and that local ordinances delegate promotional authority to the Borough Manager, not to Defendant.  (*Id.*).  In response, Plaintiff incorporates the same argument discussed in Section III.B., *supra*, namely, that Van Kruiningen's testimony creates a dispute as to whether Defendant influenced the 2018 promotion decision.  (Opp. at 18 n.2).  Defendant's argument fails for two reasons.  First, on a motion for summary judgment, the Court is concerned with evidence as opposed to pleadings in the complaint.  *See Celotex*, 477 U.S. at 324.  Second, as the Court discussed in its previous opinion, Defendant "mischaracterizes the law regarding individual liability."  *Corcoran*, 2019 WL 3774591, at *4.  As noted above, the "substantial or motivating factor" standard applies to causation, not to individual liability.  *See, e.g.*, *Suppan*, 203 F.3d at 235; *Conard*, 902 F.3d at 184.  And the Court has already found that genuine issues of material fact exist as to causation.  *See* Section III.B., *supra*.

The Court recognizes that "[a] defendant in a civil rights action must have personal involvement in the alleged wrongs."  *Rode*, 845 F.2d at 1207; *see also Alexander v. Fritch*, 396 F.

---

[9]    Defendant largely repeats the same argument that the Court addressed and rejected under the pleading standard in denying Defendant's motion to dismiss.  (*Compare* Mov. Br. at 18–19 *with* D.E. No. 5-1 at 14–15).

App'x 867, 874 (3d Cir. 2010) ("Individual liability can be imposed under § 1983 only if the defendant played an 'affirmative part' in the alleged misconduct.").  A plaintiff in a civil rights action can demonstrate a defendant's individual liability by showing "participation or actual knowledge and acquiescence" in the retaliatory action.  *Rode*, 845 F.2d at 1207; *see also Mrazek*, 2016 WL 5417197, at *12 (finding record evidence suggesting that the defendant improperly influenced the promotion process based on the plaintiff's union activity sufficient to defeat summary judgment).  Consistent with Plaintiff's position, the record creates a genuine dispute of fact as to whether Defendant improperly influenced the decision not to promote Plaintiff.  Accordingly, summary judgment is inappropriate.

## IV.    CONCLUSION

For the foregoing reasons, the Court **DENIES** Defendant's motion for summary judgment. An appropriate Order accompanies this Opinion.

**Dated:** April 5, 2023

_s/Esther Salas_____
**Esther Salas, U.S.D.J.**